In re Petition of Gareth Howard **HUGHES** and, John C. McKenna, as Joint Provisional Liquidators, Carolina Reinsurance Limited, Debtor in Foreign Proceedings.

No. 01–16090 (BRL).

United States Bankruptcy Court, S.D. New York.

July 26, 2002.

LeBoeuf, Lamb, Greene & MacRae, LLP, by Ralph R. Mabey, Peter A. Ivan-

ick, William G. Primps, Of Counsel, Steven Levitsky, Of Counsel, New York City, Attorneys for the Joint Liquidators of Carolina Re.

Skadden, Arps, Slate, Meagher & Flom, LLP, by John L. Gardiner, Jay M. Goffman, Edward J. Yodowitz, New York City, Attorneys for Deloitte & Touche LLP.

## MEMORANDUM DECISION AND ORDER DENYING MOTION TO QUASH SUBPOENAS

BURTON R. LIFLAND, Bankruptcy Judge.

This is an ancillary case to a foreign proceeding commenced by John C. McKenna and Gareth Howard Hughes (the "Joint Liquidators"), as the Joint Provisional Liquidators of Carolina Reinsurance Limited, ("Carolina Re"), a reinsurance company incorporated under the laws of Bermuda, with its registered office in Bermuda, and its principal place of business in North Carolina. The matter presently before the Court is Deloitte & Touche LLP's ("Deloitte") motion to quash subpoenas ("Motion to Quash") served on two Deloitte employees by the Joint Liquidators.

*Background*

On November 30, 2001, the Supervisor of Insurance in Bermuda filed a petition for the winding up of Carolina Re with the Supreme Court of Bermuda on the basis that Carolina Re was unable to meet the margin of solvency required by the Insurance Act 1978 and further was unable to pay its debts. The following December, the Supreme Court of Bermuda appointed the Joint Liquidators. In December 2001, the Joint Liquidators commenced this an-

cillary proceeding (the "304 Proceeding") pursuant to section 304 of title 11, United States Code (the "Bankruptcy Code"). The purpose of the ancillary proceeding is to assist the Joint Liquidators in their investigation of the financial affairs of the company, by enabling them to gather documents, books and records which concern Carolina Re and are located in the United States.

Before its winding-up, Carolina Re was a captive reinsurer for a pool of three Japanese reinsurers, (the "Fortress Pool")[1] each of which had appointed Fortress Re, Inc. ("Fortress Re") to act as its managing agent for the purposes of writing reinsurance on their behalves. For the last 20 years, Fortress Re and Carolina Re have been owned and operated by the same three individuals.[2] Deloitte audited the financial statements of Fortress Re, while Deloitte & Touche Bermuda ("Deloitte Bermuda"), assisted by Deloitte personnel, audited the financial statements of Carolina Re. Deloitte also audited certain financial information for the Fortress Pool. The Fortress Pool, heavily committed to the aviation reinsurance market, has suffered substantially from its exposure to the September 11 attacks on the World Trade Center, and other recent aviation disasters.

Although Carolina Re is incorporated in Bermuda, it operated from North Carolina, and most of the audit work was performed in the United States. Ms. Kristan Meehan, a Deloitte employee based in Deloitte's Hartford, Connecticut office, was a manager on certain of Carolina Re's

1. The Fortress Pool consisted of Nissan Fire and Marine Insurance Co., Ltd., ("Nissan") Taisei Fire and Marine Insurance Co., Ltd. ("Taisei"), and Aioi Insurance Co., Ltd. ("Aioi"). Taisei is currently undergoing insolvency proceedings before the Tokyo District

Court, and an ancillary 304 proceeding was commenced in this Court on December 12, 2001.

2. Maurice Sabbah, Kenneth Kornfeld and Charles Edelman.

audits, while Mr. John Slusarski, a Deloitte employee in the same office, provided actuarial services in connection with the audits of Fortress Re and Carolina Re.

In December, 2001, the Joint Liquidators served document requests on Deloitte pursuant to this Court's order dated December 12, 2001 (the "Preliminary Injunction Order"), which preliminarily enjoined actions against Carolina Re and directed various persons, including Deloitte, to produce documents relating to Carolina Re. In connection with the production, Deloitte and the Joint Liquidators entered into a confidentiality agreement (the "Confidentiality Agreement"). Following the production of the requested documents, the Joint Liquidators subpoenaed Ms. Meehan and Mr. Slusarski for depositions.

Deloitte now moves to quash the subpoenas issued to its employees, claiming that (1) the depositions are being sought for an improper purpose—namely, to try to establish a claim against Deloitte; and (2) in the context of a 304 ancillary proceeding, United States courts cannot order discovery beyond that which would be available in the home court, (in this case, Bermuda), and that a Bermuda court would not permit depositions under these circumstances.

*Discussion*

First, Deloitte argues that the subpoenas are improper because they are primarily sought for the purpose of investigating potential claims that Carolina Re may have against Deloitte. However, the investigation of potential claims on behalf of a debtor is not an improper use of Rule 2004 discovery. *See In re Petition of Brierley (Brierley)*, 145 B.R. 151, 170 (Bankr. S.D.N.Y.1992) ("discovery ought to be permitted to ascertain the existence of such property, which may consist of a claim or of something more tangible."). Rule 2004 of the Federal Rules of Bankruptcy Proce-

dure provides courts with the authority to order examinations with respect to the financial matters of debtors as well as other matters affecting the administration of the estate. Fed. R. Bankr.P.2004. "The understanding generally acceptable today is that the scope of a Rule 2004 examination is very broad." *In re Drexel Burnham Lambert Group, Inc. (Drexel Burnham)*, 123 B.R. 702, 711 (Bankr.S.D.N.Y.1991); *In re Gee*, 53 B.R. 891, 899 (Bankr. S.D.N.Y.1985). Moreover, it is well settled that the scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a "fishing expedition." *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir.1994); *In re Duratech Indus.*, 241 B.R. 283 (E.D.N.Y.1999). In fact, a third party who has a relationship with the debtor may be subject to a Rule 2004 examination in order to aid in discovery of assets. *See In re Ionosphere Clubs, Inc.*, 156 B.R. at 432. Furthermore, section 105(a) of the Bankruptcy Code "sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code." *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir.1986). Accordingly, even if the Joint Liquidators use information gained from testimony taken pursuant to the subpoenas to assess potential claims of Carolina Re, this would not be an improper use of discovery under Rule 2004. *See Drexel Burnham*, 123 B.R. 702 at 712 (pending litigation by or against the trustee is not sufficient cause to deny Rule 2004 examination); *Brierley*, 145 B.R. at 151, 169 (allowing foreign representative's Rule 2004 discovery request in a 304 proceeding); *In re Gee*, 53 B.R. 891, 899 (Bankr.S.D.N.Y.1985) ("there is a sufficient jurisdictional predicate to allow discovery to ascertain the existence and loca-

tion of the debtor's assets, including any causes of action which it may possess").

■ Deloitte also challenges the propriety of the subpoenas by arguing that in the context of a 304 ancillary proceeding, this Court cannot order discovery beyond that which would be available in the Bermuda Court, relying on *In re Hopewell Int'l Ins. Ltd., (Hopewell)*, 258 B.R. 580 (Bankr. S.D.N.Y.2001), and that the Bermuda Court would not permit depositions under these circumstances. The *Hopewell* decision, however, is quite distinguishable, and was based on a very different set of facts. In *Hopewell*, the liquidators of a Bermuda debtor had commenced a section 304 proceeding, in part, to enjoin proceedings in the United States brought by a creditor and to require that creditor to arbitrate its claims against Hopewell in Bermuda under Bermuda procedural and substantive law. *See id.* at 582. The bankruptcy court granted the relief sought and the arbitration proceeding went forward in Bermuda. Hopewell then returned to the bankruptcy court seeking discovery in connection with the Bermuda *arbitration proceeding.* The bankruptcy court denied the request for discovery finding first that the liquidator was not seeking disclosure in connection with its general efforts to administer the liquidation proceeding but rather in connection with a separate arbitration proceeding in which it was a litigant. The court noted that it would distort the purpose of section 304(c)(1) (which requires just treatment of all holders of claims) "to provide discovery rights to one party to a matter but not the other and create a fundamental unfairness that Congress could not have intended." *See id.* at 585. The court also found that the discovery sought was "particularly inappropriate as it involve[d] an arbitration, which is supposed to take place with a minimum of court supervision or interference" and not-

ed that the Second Circuit has held that discovery should not be available on demand to litigants in a foreign *arbitration. See id.* at 585. To the extent that Deloitte argues that *Hopewell* stands for the general proposition that discovery in a section 304 proceeding is restricted to the type of discovery permitted under the laws of the jurisdiction where the main proceeding is taking place, I disagree. Such an interpretation is inconsistent with the purpose underlying section 304 and other federal laws governing cross-border discovery.

Section 304 was enacted as part of the Bankruptcy Reform Act of 1978, and was intended to address the complex and increasingly important problems involving the legal effect domestic courts will give to foreign bankruptcy proceedings. In order to administer assets in the United States and prevent piecemeal dismemberment by local creditors of assets located here, the representative of a foreign debtor may commence a section 304 proceeding, ancillary to the main proceeding in the foreign country. *See* 11 U.S.C. § 304; *S.Rep. No. 989,* 95th Cong., 2d Sess. 35, *reprinted in* 1978 *U.S.Code Cong. & Ad. News* 5787, 5821 *(Senate Report);* H.Rep. No. 595, 95th Cong., 2d Sess. 324–25, *reprinted in* 1978 *U.S.Code Cong. & Ad.News.* 5963, 6281 *(House Report).* This remedy is intended to be broad and flexible. *See id.; see also Cunard Steamship Co. Ltd. v. Salen Reefer Services AB, (Cunard Steamship Co.),* 773 F.2d 452 (2d Cir.1985) *citing Angulo v. Kedzep, Ltd.,* 29 B.R. 417, 419 (S.D.Tex.1983) (ancillary proceeding under section 304 is flexible enough to be used for limited purpose of obtaining discovery); *Hearings on H.R. 31 and H R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Cong.2d Sess., Serial 27, 1509–10 (1976) (Statement of Prof. Stefan A. Riesenfeld). Prior to the adoption of the Bankruptcy Reform Act, there was relatively little coordination of internation-

al insolvency proceedings, and plenary proceedings in multiple jurisdictions often were necessary. Accordingly, section 304 was intended to enable domestic courts to aid foreign courts, so as to promote a more efficient and economic administration of transnational insolvency proceedings. As the House Report explains:

> The court is to be guided by what will best assure an economical and expeditious administration of the estate ... These guidelines are designed to give the court the maximum flexibility in handling ancillary cases. Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.

*House Report, supra,* at 324–325, U.S.Code. Cong. & Admin.News 1978, at 6281.

■ It is clear, from both legislative history and relevant caselaw, that section 304 was intended to provide United States courts with broad authority and flexibility to enable foreign representatives to administer assets located in the United States. *See Hopewell,* 272 B.R. at 404 ("The U.S. Court may, in a section 304 proceeding, grant broad relief, including an injunction against the commencement or the continuation of an action against the foreign debtor's property and the turnover of such property to the foreign representative."); *see also In re Culmer,* 25 B.R. 621, 624 (Bankr.S.D.N.Y.1982) ("pursuant to section 304(b), the court is free to broadly mold appropriate relief in near blank check fashion.").

Additionally, although not yet enacted, the power to order disclosure of the type proposed here is contemplated in the new chapter 15 of the Bankruptcy Code (passed by the Senate and the House)[3] which is modeled after the Model Law on Cross Border Insolvency adopted by the United Nations Commission on International Trade Law. *See* H.R. 2415, 106th Cong.2d Sess.; S.3186, 106th Cong., 2d Sess.; H.R. 333, 107th Cong. (2001); S. 420, 107th Cong. (2001). Chapter 15 specifically permits a recognized foreign representative to examine witnesses and take evidence regarding the debtor's assets, affairs, obligations or liabilities, subject to due protection of the rights of creditors and other interested entities. *See* Proposed § 1521(a)(4); *see also* Art. 21(1)(d), Art. 22 of the U.N. Comm'n on Int'l Trade Law, Model Law on Cross–Border Insolvency with Guide to Enactment, U.N. Sales No. E.99.V.3, United Nations Commission on International Trade Law, 30th Sess., at 3, U.N. Doc. A/CN.9/442 (1997), reprinted in 6 Tul. J. Int'l & Comp. L. 415, 439 (1998). As noted by the *Hopewell* court, "[a]lthough 304 is narrower than the Model Law, its broad, remedial purposes would likely allow the court in an appropriate case to provide discovery in aid of the claim liquidation efforts of a foreign representative." *Hopewell,* 258 B.R. at 585.

The liquidation of Carolina Re is an arduous process, and the Joint Liquidators are still investigating the affairs of the company, as well as the reasons behind Carolina Re's insolvency. Moreover, the financial affairs of Carolina Re are complex, and many of the documents that have been produced, according to the Joint Liquidators, are unclear and require further explanation and interpretation. *See McKenna Declaration* at ¶¶ 4, 9–13. The Joint Liquidators are officers of the Bermuda Court and their powers and duties are set out in the order appointing them.

---

**3.** Media reports indicate that Chapter 15 is expected to be enacted by Congress within the next several days or weeks.

*See Declaration of Jennifer Fraser in Support of the Verified Petition of the Foreign Representatives for the Commencement of a Case Ancillary to a Foreign Proceeding Pursuant to Section 304 of the Bankruptcy Code and Motion for a Temporary Restraining Order and a Preliminary and Permanent Injunction Under Section 304(b) of the Bankruptcy Code* ("Fraser Declaration") at ¶¶ 11,12. The Bermuda Court Order appointing the Joint Liquidators (the "Bermuda Order") lists the Joint Liquidators' powers and duties to include, among other things, the power to:

(a) ascertain the assets of the Company and their situs and take all steps necessary including Court actions where appropriate to obtain possession of such assets, . . . . . and to bring the same under their control, . . . [and] to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located;

(b) see, review, secure, take possession of and copy any books, papers, writings, documents and records relating to the accounts and audits of the Company's accounts that are located in the offices of its auditors or any other person both in the jurisdiction and in any other jurisdiction; . . .

(d) conduct such investigations and obtain such information as is necessary to locate, protect, secure, take possession of, collect and get in the assets of the Company and determine liabilities or to enable the liquidation to proceed in a speedy and efficient manner;

(e) do all such things as may be necessary or expedient for the protection of the Company's property or assets; [and] . . . . .

(f) do all things incidental to the exercise of the foregoing powers.

*See Fraser Declaration* at ¶ 12.

Accordingly, the discovery sought here, namely, the depositions of the manager on certain of Carolina Re's audits, and the individual who provided actuarial services in connection with the audits of Fortress Re and Carolina Re, are clearly within the powers entrusted to the Joint Liquidators by the Bermuda Court, section 304 of the Bankruptcy Code and Rule 2004 of the Federal Rules of Bankruptcy Procedure. Furthermore, use of the Rule 2004 discovery tool is completely consistent with the mandate by the Bermuda Court directing the very form of discovery contemplated by Rule 2004. The issues concerning the insolvency of Carolina Re, and when Carolina Re became insolvent requires the Joint Liquidators to understand as much as possible about the financial affairs of Carolina Re. The information and knowledge which the Deloitte employees are likely to have is essential to this investigation.

Although neither side referred in their moving papers to the ancillary and discovery provisions in title 28, section 1782(a) of the United States Code, section 1782(a) is most instructive. 28 U.S.C. § 1782(a). Section 1782(a) enables a district court, of the district in which a person resides or is found, to order such person to give testimony for use in a proceeding in a foreign tribunal, and provides that the testimony shall be taken in accordance with the Federal Rules of Civil Procedure. 28 U.S.C. § 1782(a). This statute affords access to discovery of evidence in the United States for use in foreign proceedings. *See In re Edelman v. Taittinger,* 295 F.3d 171 (2d Cir.2002). Moreover, section 1782 does not limit discovery to that which would be permitted in the foreign state where the litigation is taking place. *See Foden v. Gianoli Aldunate,* 3 F.3d 54, 58–61 (2d Cir.1993) (no implicit requirement in § 1782(a) that evidence be discoverable under law of foreign jurisdiction). Furthermore, section 1782(a) is consistent with section 304's policy of enabling U.S. courts

to assist foreign courts, particularly in matters involving discovery. *See Brierley,* 145 B.R. at 160–61. In *Brierley,* the Court noted that when determining the scope of discovery permissible in a 304 proceeding, section 304 should be read together with 28 U.S.C. section 1782(a), to further evidence Congress' intention to aid foreign tribunals, "be the proceedings before them bankruptcies or litigations." *See id.* at 160–61 ("[i]f a litigant can take discovery in the United States just for the asking, there is no sensible reason to impose a requirement that a foreign representative seeking discovery must first prove that the foreign debtor could have been a debtor under our laws.").

Although not required, *see In re Gross,* 278 B.R. 557 (Bankr.M.D.Fla.2002) (304 court need not rely on procedural rules of foreign jurisdiction) even if this Court were to determine whether, under the circumstances presented, the Bermuda Court would grant the discovery sought by the Joint Liquidators, I would give credence to the argument and persuasive authority contained in the *Declaration of Gabriel Moss QC, in Opposition to Deloitte's Motion to Quash (Moss Declaration).* Gabriel Moss QC is a barrister with the rank of Queen's Counsel who has argued many of the leading relevant cases before the House of Lords, and is a leading authority on insolvency matters in the United Kingdom and the Commonwealth jurisdictions. Both sides agree that section 195 of the Companies Act of 1981 is the applicable Bermuda law. *See* Companies Act § 195(1). Section 195 gives a Bermuda court the power to summon before it any person the court deems capable of "giving information concerning the promotion, for-

mation, trade, dealings, affairs or property of the [insolvent] company." *Id.* Moreover, pursuant to Bermuda's Winding–Up Rules, the Official Receiver may "put such questions to the persons examined." *See* Winding–Up Rules § 50(1). When determining the applicability of section 195, Bermudian courts, which follow English caselaw, balance the reasonable requirements of the liquidator with any alleged oppression of the proposed examinee. *See British & Commonwealth Holdings PLC* (1992) 3 WLR 853, 862; *Re John T. Rhodes Ltd.* (1986) 2 BCC 99284.

Mr. Moss opines that a Bermuda Court would find that the Joint Liquidators had established a reasonable requirement for the requested subpoenas, pursuant to *Re Bishopgate Investment Management (Bishopgate) (no. 2)* (1994) BCC 732, because the documentation produced by Deloitte is not self-explanatory, and the Joint Liquidators need to obtain an understanding of these documents from the Deloitte employees in order to carry out the duties and powers entrusted to them by the Bermuda Order appointing the Joint Liquidators, *See Moss Declaration* at 13. I agree. Moreover, it appears from the relevant Bermuda caselaw that a Bermuda court would conclude that Deloitte's request for help in explaining Carolina Re's substantial losses is not oppressive. See *Bishopgate* (1994) BCC 732.[4] After performing the balancing test, it is apparent that a Bermuda Court would conclude that the reasonable requirements of the Joint Liquidators outweigh any perceived oppression to the two Deloitte employees who audited Carolina Re's accounts, and therefore, the subpoenas would be permitted under Bermuda Law.

---

4. In *Bishopgate,* Lord Hoffman explained that it is considered oppressive to interrogate someone who is suspected of wrongdoing and to require him to prove the case against him out of his own mouth. *Bishopgate* (1994)

BCC 732. However, Lord Hoffman goes on to explain that in *Cloverbay Ltd. v. Bank of Credit and Commerce Int's SA (Cloverbay)* (1991) Ch. 90, at 109, one of the main reasons why the *Cloverbay* court found an examina-

In sum, the depositions sought by the Joint Liquidators further the policies of section 304 and Rule 2004 by enabling the Joint Liquidators to exercise the powers entrusted to them by the Bermuda Court, namely, to investigate Carolina Re's financial affairs, and contribute to an economical and expeditious administration of this estate. Accordingly, Deloitte's Motion to Quash is denied.

IT IS SO ORDERED.

tion oppressive, was because "there was a direct accusation of fraud against the persons sought to be interrogated." *See Bishopgate* (1994) BCC 732. However, there is no showing of oppression when, lacking a direct accusation of fraud, the liquidators are primarily concerned with the extent of a third party's (in this case, Deloitte's) knowledge, or what they should have known about the company.

*See id.* Lord Hoffman ultimately concluded that when a third party had who had a continuing and profitable relationship with the company, and as a result of that relationship was, or ought to have been, aware of the Company's financial affairs, a request that they should assist the liquidators by providing information is not oppressive.